Harold E. **HAYWARD**, Appellant,

v.

Dr. Dean H. **ECHOLS** et al., Appellees.

No. 22176.

United States Court of Appeals
Fifth Circuit.

June 22, 1966.

L. Arnold Pyle, Robert H. Weaver, Jackson, Miss., David C. Treen, New Orleans, La., Beard, Blue, Schmitt & Green, New Orleans, La., Watkins, Pyle, Edwards & Ludlam, Jackson, Miss., of counsel, for appellant.

Richard C. Baldwin, Henry B. Alsobrook, Jr., Adams & Reese, W. Ford Reese, New Orleans, La., for appellees.

Before RIVES and GEWIN, Circuit Judges, and ALLGOOD, District Judge.

GEWIN, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Eastern District of Louisiana dismissing appellant's case for failure to prove a cause of action sounding in tort. The controversy involves a diversity suit for damages filed by appellant against various doctors and a hospital for personal injuries sustained during the course of a brain operation.[1] The case was tried by the court sitting without a jury.

Plaintiff below (appellant) Harold E. Hayward, developed neuralgia pains sometime during 1957, which were ultimately concentrated in the posterior area of the right side of his mouth near the base of the tongue.[2] Plaintiff testified that during 1958 the pain became progressively worse "until I was just frantic." In 1959 he was still experiencing rather severe pain and decided to consult physicians at the Ochsner Clinic in Jefferson Parish, Louisiana, concerning possible steps which might either arrest or alleviate his suffering. On arriving at the Ochsner Clinic he was told that Dr. Ochsner was out of town, but he was referred to Dr. Dean Echols for an interview. On discovering that Dr. Echols also was out of town, plaintiff was then referred to Dr. John Jackson, a member of the staff at the Ochsner Foundation Hospital. Plaintiff gave Dr. Jackson a complete history of his difficulty, informing this physician that he had previously seen neurosurgeons in Jackson, Mississippi and Memphis, Tennessee, about his case and that they were of the opinion that his neuralgia pains involved the fifth cranial nerve.

Dr. Jackson, however, diagnosed the trouble as ninth nerve neuralgia rather than fifth nerve neuralgia and told Mr. Hayward that the ninth nerve operation would have far less serious residual effects than the fifth nerve operation which would deaden or anesthetize one-half of his face. Previously, Mr. Hayward had been apprised of the severe consequences of the fifth nerve operation and was anxious to avoid it, if possible. The interview and examination by Dr. Jackson lasted approximately one hour and 15 minutes, and as plaintiff recalls he was told by Dr. Jackson that Dr. Echols, Head of the Department of Neurosurgery at Ochsner Clinic, would contact him upon the latter's return to New Orleans.

Several days later plaintiff had a telephone call from Dr. Echols. During this conversation, plaintiff testified: "Dr. Echols and I talked about it, about the treatment, about the treatment of the

1. The suit named as defendants Doctors Dean Echols, John D. Jackson, Henry Mostellar, the Alton Ochsner Medical Foundation Hospital and the carrier, Aetna Casualty and Surety Company.

2. In this type of condition, location of the pain may be difficult. The patient's statement as to the location of the painful area is important and is given serious consideration by the diagnosing physician, along with other diagnostic procedures such as observation, interview of the patient, the application of a pontacaine solution, and the use of a pointed instrument to help locate the affected area. There was some history of pain in the right upper lip and areas of the face when the condition first developed, but the great preponderance of the evidence as to the symptoms revealed to Drs. Jackson, Mostellar and Echols definitely established the painful area as the right tonsillar area, at the base of the tongue and just posterior to the last tooth. As mentioned hereafter, the fifth cranial nerve supplies the front one-third and the ninth cranial nerve supplies the back two-thirds of the tongue. The pain resulting from involvement of either of these nerves is essentially identical. Location of the pain is the important factor.

spray he wanted me to try on my mouth inside. He told me what to get, I got it, and he told me to try it and let him know the results." Dr. Echols testified that he made no record of this telephone conversation, but that he told the plaintiff to obtain from a pharmacist a 2% Pontacaine solution and to spray his tonsil region to the back of his tongue for the purpose of determining whether this would give him some relief. Dr. Echols explained to Mr. Hayward that if he was actually suffering from ninth nerve neuralgia, the pontacaine solution should control the pain to some extent.

Actually, the use of the pontacaine solution is not intended as a treatment or cure of the condition from which Mr. Hayward was suffering. While, in a proper case, one obtains temporary relief from the pain by using the spray, its chief purpose is a diagnostic test. Mr. Hayward testified that his pain was relieved for a period of 30 to 45 minutes after the spray was applied.[3]

No further examination of the plaintiff was conducted until October 18 or 19, 1959, when he was admitted to the Ochsner Foundation Hospital prior to the ninth nerve operation. Dr. Echols testified that his assistant, Dr. Mostellar went to see Mr. Hayward about an hour after he was admitted to the hospital on the evening of October 18, 1959, and "he recorded a brief note." The following morning Dr. Mostellar examined the patient, interviewed him, recorded his observations and made his diagnosis. The diagnosis read in part:

"Impression: (1) Tic douloureau, mainly glossopharyngeal tic. This

may have a latent trigeminal component." [4]

Dr. Mostellar felt that the principal difficulty was ninth nerve neuralgia, but there was also the possibility of a latent fifth nerve disorder. Since Dr. Echols had not seen the patient personally at this time, he stated that he did not make his diagnosis of plaintiff's disorder solely on the strength of Dr. Mostellar's or Dr. Jackson's conclusions. The following testimony describes the antecedent procedure Dr. Echols utilized before making his final diagnosis as ninth nerve neuralgia:

"Q. Dr. Echols, under the standard custom in the practice of neurosurgery in the New Orleans area and particularly at the Foundation Hospital are residents or students in neurosurgery, such as Dr. Mostellar was in October 1959 permitted to make a final diagnosis that is relied upon by the neurosurgeons?

"A. They are required to make and record their diagnoses, right or wrong. The neurosurgeon of course, cannot rely on the man he is teaching for correctness in diagnosis. * * *

"Q. All right, sir. What did you do, as the neurosurgeon who was to operate on Mr. Hayward, immediately following the receipt of Dr. Mostellar's report of his interview on the day before the operation?

"A. Well, I realized that I was a little bit on the spot. Dr. Jackson said he thought that this was ninth neuralgia, but he had a little reservation in his mind and had told me so, and so forth. My assistant, Dr. Mostellar,

---

3. In response to questions by the Court, Dr. Echols testified as follows:

"THE COURT: Let me ask you this. You said he said the Pontacaine had helped him a great deal. If he was correct in that why did you go forward with the surgical procedure anyway?

"THE WITNESS: Because one can't control pain perfectly with spraying the throat.

"THE COURT: You mean that was just a temporary——

"THE WITNESS: It's strictly a test, a diagnostic test.

"THE COURT: I see. You didn't have any idea, at any rate, that he was going to go on the rest of his life using that spray?

"THE WITNESS: No, sir, that's never been done."

4. "Glossopharyngeal tic" is the technical name for ninth nerve neuralgia. Fifth nerve involvement is called trigeminal neuralgia.

had said this is mainly ninth nerve neuralgia, but he had a little reservation. So, I saw that I had to make the decision myself—So I went to see Mr. Hayward and did talk to him. I asked him if he tried the Pontacaine spray on the tonsil region of his tongue and he pointed to the Pontacaine atomizer which was at his bedside. He said 'Yes, I've been using this frequently during the day. It is controlling the pain very well.' I said 'Do you have any pain anywhere on your face, or have you had any pain on your face anywhere?' He said, 'No, its all been in my tongue and just behind my third lower tooth,' And I said, 'What part of your tongue?' because that is important, since the fifth nerve supplies the front one-third of the tongue, and the ninth nerve supplies the back two-thirds of the tongue. I said, 'Is this pain at the tip of your tongue?' He said, 'Where?' and Mr. Hayward, at my request, opened his mouth widely and put his finger in his mouth and pointed way back to the back of his tongue and to his tonsil region.

"Then on the strength of his personally telling me where his pain was located and what it was like, after telling me that he did not have pain in his forehead, eyes, cheeks, upper lip, lower lip or the front of his tongue, and after telling me that the Pontacaine did a good job of controlling his pain, I said to him, 'I am satisfied that you are suffering from ninth nerve neuralgia and I want to cut your ninth nerve this morning.'"

This conversation took place some fifteen to twenty minutes before the patient was due to be transported to the operating room. When asked why he did not see Mr. Hayward personally as his patient long before this pre-operative interview, Dr. Echols said: "I can't recall what I was doing, but I assume that I was just too busy to be there until the last minute." He testified that in most cases he interviewed his surgical patients in his own office prior to the operation if at all practicable but "I see those who don't come to the office but go directly to the hospital, I see them in their room in the hospital ahead of time." After permission to operate had been granted by the plaintiff, he was taken to the operating room and the surgery performed. Dr. Echols entered into an extensive and detailed discussion of the surgical procedures he employed in cutting the plaintiff's ninth cranial nerve, answering all questions put to him in a most candid and forthright manner. We see no need to summarize in detail this aspect of the case. In brief, the ninth nerve was severed by Dr. Echols and he stated in this regard: "After cutting the ninth nerve at point (c) and taking ahold of the nerve with my fine forceps at point (a) and getting the scissors ready to cut it at point (a), this nerve slipped out of my forcep and vanished out of my forcep and floated away and I never saw it again." [5] He testified further that he did not

---

5. The purpose of removing a portion of the nerve and the effect of a failure to do so was explained by Dr. Echols as follows:

"I'd like to say this. That it is standard practice all over the United States for a surgeon to send a piece of whatever he finds to pathology. It is a requirement of hospitals in every city. If the appendix is removed it must be sent to pathology. This applies to any kind of cyst or tumor or organ that is removed. And, if any surgeon cuts a nerve in the arm or the leg, or anywhere in the body, he is supposed to send a piece of that nerve to pathology to prove that it was a nerve he cut, not a vein or a blood vessel that he mistook for a nerve.

Now, this operation is so tricky, these nerves are so fine that not very often does a neurosurgeon get a chance to remove part of a fifth nerve, the seventh, ninth nerve or the tenth nerve to send to pathology, but it has been done and I was trying to send a piece of this ninth nerve to our pathologist because I had a good view of it. It looked like an easy thing to do.

"Q. But there was no requirement under the standard practices and procedures of the profession, or any law of the state of Louisiana, or of the United States that you do remove a segment of the ninth nerve and send it for pathological study, was there Doctor?

"A. That's correct. It is understood by all hospitals in this country that it is

probe for this lost nerve fiber because he did not wish to damage the tenth nerve at all, "much less brush it aside and so on." The operation took 2 hours and 15 minutes to perform and then Mr. Hayward was taken to the recovery room for the night.

Soon after he regained consciousness and while still in the recovery room, he discovered that the neuralgia pains were still present and when this fact was communicated to Dr. Echols, he also readily admitted "that Mr. Hayward still was having neuralgia pains." Dr. Echols saw the plaintiff twice in the recovery room according to the recovery room notes. He stated in this connection: "I remember very well realizing that Mr. Hayward still was having neuralgic pains." As to the nature of his diagnosis of the plaintiff's condition after surgery, Dr. Echols testified, "I suddenly realized that this wasn't something from the anesthetic and that something had gone wrong and that we were dealing with a complication and I realized that his vagus nerve was not working." The vagus nerve is the tenth cranial nerve. When it is paralyzed or fails to function, the right vocal cord fails to function properly and the patient also has difficulty in swallowing. Asked when, in his opinion, the plaintiff's vagus paralysis took place, he stated: "I don't know the mechanism of this vagus paralysis and I didn't realize he really had a vagus paralysis for three days and I'm in no position to speculate as to the moment or hour or day that it happened. I only know that it happened sometime between the beginning of the operation and three days later." He further testified that he was unable to say whether the plaintiff's complications took place in the operating room during the course of the operative procedure or at a later time. He did not know what caused the condition.

Plaintiff has never fully recovered the use of his voice as a result of the vagus nerve paralysis and the pains have continued. Subsequently, he had a neurosurgeon in his own community sever his fifth cranial nerve. The result of this latter operation was successful insofar as the neuralgia pains are concerned, but plaintiff is still suffering from hoarseness due to the paralysis of his right vocal cord controlled by the vagus nerve. It is uncontested that the injury to plaintiff's throat is substantial and permanent. In this suit he alleged negligence and carelessness on the part of the defendants which resulted in the performance of improper and wrongful surgery, and that he was damaged and injured as follows: (1) paralysis of the tenth cranial (vagus) nerve; (2) paralysis of the right half of his larynx causing him to be unable to swallow without great pain; (3) permanent impairment of his voice; (4) plus additional pain and mental anguish.

a difficult thing to do as a routine, to send part of the fifth nerve or the ninth nerve to the lab, so that is excluded from the requirements."

\* \* \* \* \*

"Q. And in the final analysis it was not necessary, for a complete, successful operation on Mr. Hayward, that this section of nerve be removed from his brain? That is, the segment of the ninth nerve.

"A. That is correct. That doesn't add to the operation any, the sending of specimen to the lab.

"THE COURT: Doctor, once it is severed, does it make any difference if you take a segment of it out and send it anywhere you please? The operation is complete when the nerve is severed isn't it?

"THE WITNESS: Yes.

"THE COURT: As far as the results are concerned would it make any difference while you were attempting to get a segment of the nerve, that it got away from your forceps and disappeared?

"THE WITNESS: It didn't make any difference. I was only obligated to cut this nerve and if I could get a piece of it for the laboratory, so much the better. And if I couldn't, I couldn't. The laboratory doesn't require it because they know it is a tricky operation.

"THE COURT: The patient was no worse for the fact that a piece of it got away from you?

"MR. PYLE: If it please the Court—

"THE WITNESS: In my opinion it didn't make any difference to the patient whether I tried to get this piece of nerve or failed to get it."

The gravamen of appellant's negligence argument is dual in character (1) that defendant doctors and particularly the operating surgeon, Dr. Echols, were negligent in the diagnosis of plaintiff's condition which proximately caused the unnecessary operation and the resulting injuries to his throat, and (2) that the doctrine of res ipsa loquitur should be invoked since the injury to the tenth cranial (vagus) nerve occurred *during the operation* at a time when plaintiff was unconscious and under the complete control of defendant doctors and hospital.

While we wholeheartedly agree that the injury was both unfortunate and debilitating, we are nevertheless of the opinion that the District Court committed no error in dismissing the suit because the plaintiff failed to prove negligence either on the part of the physicians or the hospital involved, jointly or severally.

In considering the plaintiff's arguments seriatim, we must first deal with the contention that the operating surgeon, Dr. Dean Echols, was negligent in his diagnosis which plaintiff contends was the proximate cause of the unnecessary operation resulting in the paralysis of plaintiff's vocal cords. A careful reading of the record reveals a frank, honest and extremely forthright statement of medical practice and opinion by Dr. Echols, the only medical witness called to testify.

■ The rule is well established that a physician or surgeon cannot be held liable for injury to a patient under his treatment, where there is no evidence to show negligence or lack of skill on his part sufficient to overcome the prima facie case in his favor made by the evidence that the treatment adopted by him was the usual or customary one. Plaintiff cites no case which substantiates his negligent diagnosis contention. The two cases mainly relied upon in his argument are Meyer v. St. Paul-Mercury Indemnity Co. (1953) 225 La. 618, 73 So.2d 781; and Andrepont v. Ochsner (1955) Ct. of App.La., 84 So.2d 63, both of which are quite materially and factually different from the case at bar. In *Meyer,* the Supreme Court of Louisiana held that an oral surgeon was not negligent in failing to examine plaintiff's teeth closely for looseness before commencing a nasal endotracheal intubation preparatory to extracting all of her teeth where there was a failure of proof to show a causal connection between a failure to so examine plaintiff's teeth and the subsequent dislodgement of one tooth which fell into her lung. In *Andrepont,* the patient brought a malpractice action against a surgeon and the public liability insurer of a hospital for injuries sustained by the patient as a result of an explosion of anesthetic gas ignited by static electricity in the operating room. The Court of Appeals of Louisiana held that the evidence was insufficient to establish negligence or lack of skill on the part of the surgeon, but was otherwise sufficient under the res ipsa loquitur doctrine to hold the liability insurer of the hospital responsible for damages in the amount of $15,000.00.

Plaintiff strenuously argues that the diagnosis by Dr. Echols of ninth nerve neuralgia was a clear case of negligence in that the procedure used by him in making such a diagnosis deviated from that normally utilized by him and by neurosurgeons in the same community.[6]

6. In his brief, appellant contends:
"As the record shows, Dr. Echols admitted that he had completely deviated from his normal practice by permitting the resident doctors to interview Mr. Hayward and compile the history and symptoms and further by interviewing the patient only three to five minutes in place of his usual initial hour consultation. When this course of admitted conduct is considered together with the fact that no charge was made for the operation and, further, when it is remembered that no attempt was made by any of the doctors to glean medical history or information from Doctors Neill and Semmes, even though the issue of ninth or fifth nerve involvement was close, it is perfectly obvious that these acts or nonacts are admissions of negligence in making the diagnosis."

■ We cannot agree that such conduct, even though it might amount to a deviation in diagnostic procedure often followed by Dr. Echols, is a "perfectly obvious" admission of negligence. Where, as here, no surgeon or other expert in the field of neurosurgery testified that Dr. Echols had proceeded negligently in making the final diagnosis or in the performance of the operation, or that the operation was not proper in every respect, plaintiff is not entitled to recover for malpractice. The burden of proving malpractice by a fair preponderance of the evidence remains on the plaintiff throughout the trial. Phelps v. Donaldson, 243 La. 1118, 150 So.2d 35 (1963); George v. Travelers Ins. Co., D.C., 215 F.Supp. 340, aff'd. 5 Cir., 328 F.2d 430; Nardini v. Gilbert (4 Cir. 1958) 260 F.2d 177; Wall v. Brim (5 Cir. 1943) 138 F.2d 478; LeJeune v. United States Casualty Co. (W.D.La.1964) 227 F.Supp. 191; Dill v. Scuka (D.C.Pa. 1959) 175 F.Supp. 26. Under the facts of this case, plaintiff failed to sustain this burden of proof. The fact that Dr. Echols only interviewed the patient just prior to the operation does not, in itself, amount to negligence. Even assuming that Dr. Echols relied on the findings of Dr. Jackson and Dr. Mostellar (which assumption is rebutted by the testimony of Dr. Echols himself), such reliance would not *ipso facto* amount to negligence because the record clearly shows that Dr. Jackson was a qualified physician, a partner of Dr. Echols, and on the regular full-time staff of the Ochsner Foundation Hospital. The record shows that the plaintiff was thoroughly interviewed and examined by Dr. Jackson, Dr. Mostellar, an assistant to Dr. Echols, also interviewed and examined him. These examinations were in addition to a general physical examination and other pre-operative procedures. It was consistent with prudent medical practice for Dr. Echols to rely to the extent shown by the record on the evaluation of plaintiff's nerve disorder by the two physicians mentioned, and upon the other information furnished to him at the hospital.

Moreover, the evidence clearly establishes the fact that Dr. Echols made the final diagnosis. In the light of the legal principles herein mentioned and of the undisputed evidence in this case, it cannot be said that Dr. Echols' diagnostic procedure was negligent as a matter of law.

As to the only remaining issue, counsel are very much in disagreement on the question of whether in a case of this nature the doctrine of *res ipsa loquitur* can be applied. The plaintiff argues, citing Andrepont v. Ochsner; and Meyer v. St. Paul-Mercury Indemnity Co., supra, that *during the course of the operation* Mr. Hayward suffered serious and painful injuries of a permanent nature not ordinarily associated with the operation which was performed. He further contends that since the injury to his vagus nerve evidently occurred *while plaintiff was unconscious* and under control of Dr. Echols (a self-serving statement to say the least), it then became incumbent upon Dr. Echols and the other defendants to come forward and show that the diagnostic procedures and the manner in which the operation was performed were those which were used by similar specialists in the community. We have disposed of the question of negligent diagnosis and turn now only to the operative procedure.

■ In 38 Am.Jur., § 303, "Negligence" at p. 1000, the res ipsa loquitur doctrine is succinctly stated as follows:

"The res ipsa loquitur doctrine *does not* apply where an unexplained accident *may* be attributable to one of *several* causes, for some of which the defendant is not responsible. It should not be allowed to apply where, on proof of the occurrence, without more, the matter still rests on conjecture alone or the accident is just as reasonably attributable to *other causes* as to negligence. In other words, if the facts and circumstances of the occurrence give rise to conflicting inferences, *one leading to the conclusion of due care* and the other to the conclusion of neg-

ligence, the doctrine *does not* apply."[7] (Emphasis added)

There was direct, unrebutted testimony by the operating physician that he utilized the proper standard of care and treatment recognized in the community when he stated: "I certainly did use the standard of care characteristic of this community in both the diagnosis and the surgical treatment of Mr. Hayward." It is our firm conclusion that the evidence amply supports the conclusion reached by the trial court that the physicians were not negligent and that the plaintiff failed to prove such facts as would authorize the application of the doctrine of res ipsa loquitur. Siegel v. American Employer's Ins. Co. (5 Cir. 1964) 331 F.2d 302.

 As was so aptly stated in Phelps v. Donaldson, supra, " * * * When a physician undertakes the treatment of a case he does not guarantee a cure, nor is any promise to effect a cure or even a partial healing to be implied, nor does the law raise from the fact of employment an implied undertaking to cure, but only an undertaking to use ordinary skill and care." The record before us is totally deficient of any relevant testimony tending to show a lack of the exercise of the ordinary and usual skill and care by Dr. Echols. Furthermore, res ipsa loquitur could not be applied here to either the hospital or the other physicians involved because there was no evidence of any character from any source which remotely tended to show a breach of the proper standard of care on their part. None of the other physicians involved

and no one connected with the hospital were called to testify. Plaintiff elected not to call the other physicians or any hospital personnel when, in fact, he could have done so. Since there was no evidence or indication that the Ochsner Foundation Hospital or the other doctors were negligent, we feel that res ipsa loquitur does not apply in the circumstances present.

After a careful reading and consideration of all the evidence in this case, there is only one logical and reasonable conclusion that can be reached, and that is that the evidence clearly sustains the conclusion reached by the trial court.

The judgment is affirmed.

---

7. The plaintiff concedes that the courts of Louisiana apply "a somewhat limited version of res ipsa loquitur" in malpractice cases involving physicians. It is asserted, however, that the doctrine is not limited in its application to the hospital. The following statement from Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781, 786 (1953) is relied upon by the plaintiff:

"The rule makes it incumbent on the physician, surgeon or dentist who becomes defendant in a malpractice case to show that he is possessed of the re-

quired skill and competence indicated and that in applying that skill to the given case he used reasonable care and diligence along with his best judgment. The rule therefore may be said to bear some relation to the doctrine of res ipsa loquitur which places the burden on a defendant having control of the dangerous instrumentality which caused an accident to show his freedom from negligence in a case where such accident would not ordinarily have occurred had proper care and use been made of the instrumentality. * * * "