**Glen R. HEMINGWAY,
Plaintiff-Appellant,**

v.

**OCHSNER CLINIC and/or Ochsner
Foundation Hospital et al.,
Defendants-Appellees.**

No. 77–2178.

United States Court of Appeals,
Fifth Circuit.

Dec. 27, 1979.

Rehearing Denied Jan. 30, 1980.

Darryl J. Tschirn, John M. Robin, Covington, La., for plaintiff-appellant.

Henry Alsobrook, Jr., Gregory J. Laborde, New Orleans, La., for defendants-appellees.

Before TUTTLE, GOLDBERG and RANDALL, Circuit Judges.

TUTTLE, Circuit Judge:

The appellant here challenges the correctness of the trial court's order directing a verdict for the appellees, several doctors, the hospital and clinic with which they were associated and their respective insurance carriers. The trial court based its decision on the failure of the plaintiff to produce evidence "as to the standard of care generally practiced by other physicians in this community or in the community in which these defendant physicians practice in similar situations," and on the further ground that "there has been no evidence offered by the plaintiff tending to show that the defendant doctors negligently failed to follow such a standard." The court then determined that in the absence of adequate evidence to establish a claim against the doctors, the hospital and clinic with which they were associated could not be found negligent on the record before it.

Because we find that the defendant doctors themselves, called on behalf of the plaintiff, sufficiently established the standard of care applicable to the conduct which the plaintiff challenges in his action, and that the record discloses sufficient objective evidence from which a jury could find that such standard was not complied with, we reverse.

The plaintiff's action was based on his contention, to use laymen's language, that at a time when he was being treated for serious arterial insufficiency in his left foot the defendant doctors or other doctors and hospital personnel administered a drug which was designed to reduce or cut down the blood supply to all parts of his body. He claims that both the literature concerning the drug used and the pharmacopoeia warned against use in such circumstances, and the doctors' statement that "the standard in this community" is "that normally you don't prescribe a drug to someone who has a condition which is a contraindication" met all of the requirements for submission of the case to the jury.

## I. FACTUAL BACKGROUND

The evidence which we find was sufficient to withstand a directed verdict was produced entirely from examination and cross-examination of the defendant doctors and from the hospital and clinic records. Briefly, it will be outlined as follows: Hemingway entered the Ochsner Clinic on January 1, 1973, having been referred by the Veterans Administration. He came under the care of Dr. William Davis and Dr. McKinnon for gastrointestinal disorders. He was subjected to the usual tests and was found to be suffering from a disease of the pancreas. On January 25, Dr. McKinnon performed an 95% pancreatectomy, cholecystectomy, and splenectomy. Because plaintiff continued to suffer symptoms of pancreatitis, on April 12, 1973, Dr. McKinnon performed further complete pancreatectomy. One of the side effects of these operations is that the patient becomes a diabetic, suffering from diabetes mellitus.

After the operation, Hemingway began outpatient treatment under the care of Dr. Paul Murison, an Ochsner Foundation endocrinologist for treatment of his diabetes mellitus. He was first seen by Dr. Murison in February 1973. Dr. Murison was asked "whether or not diabetes had anything to do with vascular disease," "does one relate to the other?" He said "diabetics are more prone to develop problems with vascular." Then the further question; "more prone than . . .?;" He stated "an average person." Subsequently, during further questioning he qualified his answer by stating "certain time levels. Early in diabetes the disease is not a major problem, but after many years it becomes an increasingly important problem." Dr. Murison also testified that while in the hospital on January 3, some 20 days before the first operation, Hemingway had complained of a migraine

headache and had been given a Cafergot suppository and that at that time he had shown no adverse reaction to this dosage. It was undisputed that Cafergot contains the pharmacological properties of ergotamine which is used for the purpose of constricting blood vessels. Prolonged or excessive administration of the ergot alkaloids can cause vascular insufficiency and gangrene of the extremities. The literature which accompanies Cafergot and the pharmacy textbook introduced in evidence state that Cafergot is contraindicated for patients when suffering from certain types of vascular disease.[1]

Dr. Murison testified as to the meaning of the words "peripheral vascular disease" as follows:

Q: Would you explain to them what peripheral vascular disease is.

A: First of all, before we get to the symptoms, peripheral vascular diseases are a group of diseases in which there are problems dealing with the circulation in the extremities, the peripheral areas of the hands and the feet.

Q: By peripheral, you mean the hands or the feet, is that right, the ends of the extremities, is that right?

A: Yes.

Q: What do you say with regard to those, the vascular disease?

A: That is what peripheral vascular disease is. You asked me—

Q: I am sorry, I just want to hear the first part of your answer again. I didn't catch it.

THE WITNESS:

Would you give me the answer?

(The court reporter read the answer.)

BY MR. TSCHIRN:

Q: Dealing with circulation in the peripheral areas, would that be a layman's way of saying it?

A: Yes.

Q: So, dealing with circulation in hands or feet, is that correct?

A: Yes.

Q: That is what peripheral vascular disease is?

THE COURT:

How many times are you going over that, Counsel? That is four times, now.

BY MR. TSCHIRN:

Q: Is that correct, sir?

A: Yes.

Following this testimony, the medical witness testified that physicians originally obtain familiarity with the administration and prescribing of drugs in medical school and by keeping in constant awareness "through the medical literature, through meetings." The identified text "Pharmacological Basis of Therapeutics" is one of the textbooks with which he said he was familiar. The following evidence was then introduced:

Q: The drug Cafergot: First of all, let me ask you this. Do doctors or should doctors normally deviate or change from what the pharmacy textbooks tell them what to do as far as prescribing drugs?

Should a doctor on his own just change from that?

A: It should not be done unless there are very compelling reasons why it might be necessary or needed.

Q: So, the answer, first of all, it should not be done, is that correct?

A: That covers too much. There are certain rare instances in which you may deviate from for the good of the patient, from the restrictions that are put upon.

1. Under the heading "Contraindications" the literature accompanying the medicine states: "Peripheral vascular disease, coronary heart disease, hypertension, impaired hepatic or renal function, sepsis and pregnancy."

The textbook states under the heading "Contraindications:" Because gangrene due to ergotamine has occurred in a number of patients with infection, sepsis is a definite counterindication. It should not be used in patients with vascular disease, such as syphlitic arthritis, marked arteriosclerosis, coronary artery disease, thrombophlebitis, and Raynaud's or Buerger's syndrome. . . ."

Q: Now is that pretty much the standard in this community, that physicians should adhere, as far as prescribing and the administration of drugs—adhere to what the pharmacy textbooks tell them to do?

A: They should be acquainted with what the pharmacy textbooks say and should follow that as closely as the patient's special condition warrants.

Q: So, that is the standard, then, is that correct?

A: Yes.

Q: And is it correct, sir, that the doctors should not deviate from that unless there is such special circumstances that the doctor feels is compelling to deviate from it?

A: Yes.

Thereafter, in response to the question: "Isn't it a fact that normally you don't prescribe a drug to someone who has a condition which is a contraindication" the witness answered: "True" and to the question: "And that is a standard in this community, isn't that right?" the doctor answered: "Yes."

Towards the end of May, after he became a diabetic, Cafergot was again prescribed for Hemingway's migraine headache. This was followed by a further use of Cafergot on June 9. On June 10, plaintiff's foot began hurting and he went to the Ochsner Hospital emergency room. At that time, he reported that in handling his motorcycle, it had fallen and injured his left foot. The Ochsner Foundation Hospital "Notes and Consultant's Reports" of June 16 state: "On 6/10/73 patient was injured while riding a motorcycle [this is incorrect the motorcycle fell while he was handling it] the bike fell across his left leg and foot and incurred only minor injury, seen here, X-rays negative and sent home. Left foot began swelling two days ago and became swollen and ecchymotic. Pain, swelling, and discoloration have increased." On the

same sheet under the heading "Exam" there appears the entry "EXT—left foot cold and blue. No pulses in left foot." At the bottom of the page under the words "Imp [elsewhere used on the records to indicate "impressions"] appears the entry "acute arterial insufficiency—left foot". On June 17, it appeared that the condition of the left foot had deteriorated and Dr. John Ochsner recommended a procedure known as an arteriogram. This procedure involved the insertion of a catheter into a main artery and the introduction of a dye which permitted the medical personnel to see the flow of blood in the affected area. The arteriogram was performed and it showed "diffuse vasospasm with potency to foot. . . ." On the following day, Dr. Hutchinson made an entry "foot is more eschemic in appearance in spite of efforts at vasodilatation. Dr. Ochsner suggested the possibility of venus occlusion which may be predominant problem. Sympathectomy may be of some benefit." [2]

Thereupon, Dr. Ochsner performed a left lumbar sympathectomy which, as the witnesses testified, was for the purpose of increasing the blood supply to the affected foot.

Thereafter during the next five or six days the plaintiff's foot improved in appearance and he was released to return home. At the bottom of the sheet following the entries as to the operation, there appear the following entries:

Op. Note: Pre Op Dx—*Chronic* arterial insufficiency

Left Foot.

Post—Op. Same

Procedural—left lumbar sympathectomy

Surgeon—J. Ochsner

Assist—Ancalmo, Cofer, Manson

To R Room good condition.

J. Manson

[emphasis added]

By July 7, 1973, plaintiff's foot had turned cold again and was blue in color. He returned to the emergency room and Dr.

2. In dictionary language the first sentence of this entry means: "Foot shows more evidence of lack of blood in appearance in spite of efforts at enlarging the vessels."

Ancalmo, who had assisted with the sympathectomy, admitted him with the following physician's report:

> Post pancreatectomy for chronic pancreatitis. Developed a cold left foot four weeks ago, sympathectomy [without] gross results. Returns with same problem—poss. Buerger's disease. Admit to Dr. J. Ochsner.[3]

As indicated above, the literature with respect to Cafergot states that it is contraindicated in the case of a person who has Buerger's disease. Subsequently, at the trial, Dr. Ochsner testified that at the time Mr. Hemingway appeared on July 7, he knew that the patient was not suffering from Buerger's disease, in spite of the possibility noted by the receiving doctor. The physicians performed a continuous epidural block which relieved the plaintiff from the severe pain he was suffering and introduced medications designed to dilate the plaintiff's blood vessels in order to promote circulation in his lower leg and foot.

On the morning of July 9, two days later, plaintiff woke up with a migraine headache. At 9:30 a. m., Dr. Moseley ordered Cafergot for the plaintiff. It was administered. A short while thereafter, Hemingway was visited by Dr. Ochsner who later testified that: "This foot was well and then suddenly it turned bad under our eyes." [4]

---

3. Buerger's disease is a vascular disease known as thrombosis angitis obliterans, which means an inflammation of the blood vessels with thrombosis in the veins and arteries. It causes blood clots in the veins and arteries and may thus cut off circulation.

4. Dr. Ochsner testified to the occurrences beginning with the morning of July 9 as follows:

A: Then he asked to take some of his medication, that he had a migraine headache, and he specifically called one—or one of the residents, namely Dr. Moseley, and Dr. Moseley asked him what he took and he said he took Cafergot, had taken it for many years, so Dr. Moseley gave him the Cafergot suppository.

Q: Dr. Moseley, is he a resident?

A: Yes, sir.

Q: Who is he employed by, foundation or the hospital?

A: He is employed by the foundation, which is the hospital.

Q: Which is the hospital?

A: All right.

Q: So, Dr. Moseley, who is a doctor—then, of course, Dr. Moseley knew what his condition was at that time, is that correct?

A: Yes.

Q: He knew that you all had given him an epidural block and he knew you all had given him injections into the muscle to deaden the leg and to relax the muscle to let the blood flow so he wouldn't have a contracted or squeezed in blood vessel, is that right?

A: Right.

Q: Yet he allowed him to take Cafergot at that time?

A: Correct. He had taken it on many occasions before.

Q: Before he became a diabetic?

A: And after he became a diabetic.

Q: On two occasions that we know of he ended up in the hospital with a darkened foot—

THE COURT:

Counsel, you are arguing your case. There will be a time when you may argue your case but now is not that time.

BY MR. TSCHIRN:

Q: At any rate, Dr. Moseley allowed him or gave him the Cafergot?

A: Yes.

Q: Now, what happened after he took the Cafergot? At that time he is on the road to recovery and his foot looking good and warmness back and pain is gone and everything.

' What happened after he took the Cafergot?

A: A few hours later it began to get blue again.

Q: Turned blue again?

A: Yes, sir. That is when they came and told us the foot is getting blue again, and it was at that time that we said, well, something's got to be amiss here because this foot was well and then suddenly it turned bad under our eyes.

We went back and they said the only thing he's gotten is Cafergot. So then we automatically made the assumption that this man is— had an ergotrate intoxication from one or three reasons. We have to assume that it is a hypersensitivity because he told us up until that time that he had not taken any Cafergot prior to the admission.

Q: He told you he had not taken Cafergot prior to the admission?

A: He had not taken any drugs prior to the admission.

Q: You keep saying Cafergot.

A: Excuse me. No, I don't keep saying Cafergot.

Q: Twice you have said it, once with regard to June and once with regard to July. You said he denied taking Cafergot and he didn't deny it, did he?

This condition was slowly remedied by the same intra-arterial injections that had previously been given to dilate the vessels.

The plaintiff introduced a prescription over Dr. Murison's signature dated June 9 which provided for Cafergot, P–B suppositories, 12 of them, one rectally as needed for pain. The following colloquy then occurred:

Q: At least someone at Ochsner knew, on June 9th, before you had him in there on June 16th—someone knew he was on Cafergot, didn't they?

A: Yes, lots of people knew he was on Cafergot.

Q: I mean at Ochsner.

A: Yes.

Q: Lots of people knew it?

A: I assume. He had it two or three times before.

The recital of facts above is all undisputed, except for the fact that Dr. Murison and Dr. Ochsner undertook at the trial to qualify from time to time the statements attributed to them. We give the facts most favorable to the plaintiff, because we are required to do so in considering whether there was sufficient evidence for the case to be submitted to the jury.

In addition to the foregoing facts, there was a serious dispute about statements by Drs. Ochsner and Murison to Hemingway's mother and wife.[5] Mrs. Hemingway, Sr. testified that on July 9, she was at the hospital and her son had a severe migraine (this is the day on which Dr. Moseley had prescribed Cafergot for the migraine). She testified that his foot changed color and got cold and she got in touch with Dr. Ochsner

who then had him taken "to the operating room downstairs." At that time, she met with Dr. John Ochsner and she testified:

He said to me "your son has an artery infection or disease" which he called Buerger's which I didn't understand and I asked him what that meant, and he said it meant that the arteries were going into the foot, as they neared the foot at the ankle had collapsed and that no blood could get into the foot and that this was possible—possibility that it could happen to other parts of his body, his other leg or his arms and I asked him, I said: "Well, does this have to do with his big operation and all that? Would this cause this?" and he said: "No, this is a separate thing, a separate disease," and he said: "It is necessary that we schedule an amputation tomorrow morning at 6 o'clock."

Hemingway's wife testified that she was present at the time of this conversation and stated that her recollection was the same as testified to by Mrs. Hemingway, Sr. Dr. Ochsner testified that he had not said Hemingway had Buerger's disease and he had not said he planned to amputate the foot.

Finally, it should be noted that the admission slip on June 16 contains the entry: "PX: acute arterial insufficiency left foot" and the discharge summary, following discharge on June 23, contained the entry: "Acute arterial insufficiency [undecipherable, but possibly etiology unknown]."

## II. PRELIMINARY LEGAL QUESTIONS

■ In addition to the contention about the administering of Cafergot at a time when the doctors were attempting to clear

---

A: I said before he denied taking any drugs outside of insulin, and I will say that again.
THE COURT:
Is Cafergot a drug?
THE WITNESS:
Yes sir. It is my initial impression this man did take a drug, and you can take my entire staff and ask them that. This was my initial impression, this man was taking a drug. That is why I specifically asked him.

5. His mother and father lived in Atlanta and talked on the telephone to Dr. Ochsner on the eve of the operation performed for the sympa-

thectomy on June 17, at which time the father testified that Dr. Ochsner called him on the telephone and "said that Ronnie's foot, his left foot, was in very bad shape and that he recommended a sympathectomy, that he be operated on, because if he didn't, he was going to lose the foot and maybe part of the leg". The mother and father both went to New Orleans and arrived at the hospital just as the sympathectomy had been completed. They returned to Atlanta after the foot appeared better but went back again on July 7.

up arterial insufficiency in his left foot, Hemingway makes a further more serious contention relating to the sympathectomy. He contends that he was not advised by Dr. Ochsner of any side effects of the sympathectomy. Dr. Ochsner testified that there are no side effects. Hemingway sought to introduce at the trial a text called "Medical —Surgical Nursing" written by two registered nurses. This text listed potential results from a sympathectomy. One of these results listed by these writers was "loss of ejaculation in the male." Upon objection, the court ruled that the plaintiff had failed to establish the degree of recognition required for the introduction of such a text. This ruling was correct under Rule 803(18) of the Federal Rules of Evidence, which require that for a party to rely upon a learned treatise it must be established as a reliable authority by the testimony or admission of a witness or by other expert testimony or by judicial notice. There was no testimony that recognized this document as a reliable authority and the trial court correctly ruled that it could not be recognized by judicial notice, since it had been written by registered nurses.

■ Respecting his claim of loss of sexual powers, the appellant contends that since the proof showed that these had been unimpaired prior to the sympathectomy but had been almost totally lost thereafter, he should have prevailed under the doctrine res ipsa loquitur. The trial court properly declined to accept this contention, since there were many medical frailties affecting the plaintiff. *Hayward v. Echols*, 362 F.2d 791 (5th Cir. 1966).

We must therefore conclude that there was no proof at the trial that would have permitted the jury to have found in favor of the plaintiff as to this particular complaint.

**6.** Significantly, the Louisiana Code dealing with this subject matter has been amended and given retroactive effect, as it relates to medical or surgical specialists. La.R.S. 9:2794 provides in pertinent part:

## III. THE DIRECTED VERDICT

The parties do not disagree as to the standard to be applied by the trial court in determining whether there is sufficient evidence to warrant submitting the case to the jury. The principles enunciated in *Boeing v. Shipman*, 411 F.2d 365 (5th Cir. 1969) are too well known to require restatement here. The trial court directed the jury's verdict in favor of the defendants here on the two grounds already noted above: 1) as to the claim against the doctors, the court found that there was a failure on the part of the plaintiff to produce evidence "as to the standard of care generally practiced by other physicians in this community or in the community in which these defendant physicians practice in similar situations" and "there has been no evidence offered by the plaintiff tending to show that the defendant doctors negligently failed to follow such a standard." 2) As to the foundation and hospital defendants, the court decided that in the absence of adequate evidence to establish a claim against the doctors, the hospital and foundation with which they were associated could not be found negligent on this record.

■ We deal first with the proof of what is known generally as the "locality rule" by which the performance of doctors has traditionally been measured under the Louisiana law. The trial court cited *Hayward v. Echols*, 362 F.2d 791 as a principal basis of its determination. Both parties at the trial and in this court are in agreement that the plaintiff in a malpractice case would carry the burden of establishing that the doctor failed to meet the standard which may be expressed as it was by this court in *Mills v. Levy*, 537 F.2d 1331 (5th Cir.) at 1332:

[P]hysicians and surgeons are not negligent if they exercise that degree of skill and care which is usually possessed and exercised by practitioners of their profession in the same locality or community.[6]

(A) In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq. or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:

The language of this Court in *Hayward* must have caused the trial court here to conclude that in order to establish both the standard and the deviation therefrom in a Louisiana case there must be positive, affirmative evidence as to the abstract standard, produced independently by the plaintiff, together with testimony at the trial of a qualified physician that the defendant failed to measure up to such standards. This conclusion may have come from the language in our *Hayward* opinion:

> Where, as here, no surgeon or other expert in the field of neurosurgery testified that Dr. Echols had proceeded negligently in making the final diagnosis or in the performance of the operation, or that the operation was not proper in every respect, plaintiff is not entitled to recover for malpractice.

362 F.2d at 797.

Of course, in using such language in *Hayward*, this court dealt with the record before it. The record here is something entirely different. As shown by our recitation of the facts, the defendant doctors clearly established the community standard touching on the prescribing of medication that constricted the blood vessels at a time when the jury could infer that the defendants had knowledge that the patient was suffering from a disease evidenced by too greatly constricted blood vessels. This is clear from the testimony, quoted above, to the effect that the community standard was that a physician would not, except under exceptional circumstances, administer a drug when it was contraindicated by a disease from which the patient was suffering. Here it is clear that the jury could infer that there was ample knowledge on the part of the appropriate persons in both hospital and clinic that Hemingway was threatened by, and actually suffering from, peripheral vascular insufficiency, which Dr. Murison testified would amount to "peripheral vascular disease." The jury could also infer that at the time the sympathectomy was performed by Dr. Ochsner that procedure was thought to be required because of a condition caused by prescription by other doctors of a vascular constricting medication. Moreover, the jury could, of course, have believed the testimony of the mother and wife of the plaintiff who testified that on an occasion before the last Cafergot was prescribed for Hemingway, the surgeon had stated to them that the patient was suffering from Buerger's disease, which was clearly a contraindication for the use of such medication.

◼ So far as the responsibility of the hospital and foundation are concerned, there was further proof in the hospital and clinic records from which the jury could

---

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists practicing in the same community or locality to that in which the defendant practices; *and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.*

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

[Emphasis added.]

In *Ardoin v. Hartford Accident Indemnity Co.,* 360 So.2d 1331 (La.1978), the court indicated that this section had been modified, in effect, to permit the proof of the standard applicable to medical specialists without limiting the proof to those who are familiar with the performance within the particular locality or community.

Although some of the defendants here were specialists, it is unimportant for us to consider this section of the Louisiana Code because the actions complained of were not actions that require the services of a specialist. Moreover, as indicated by the Louisiana Supreme Court, the purpose of the legislation was to make easier, not more difficult, the proof necessary to establish the standard of performance of the professional duty of the physician. Here, the plaintiff met the more difficult "locality rule."

infer that at the time that the patient was being treated for lack of blood supply to his left foot, he was being given medication which further constricted the blood supply generally. Our attention has been called to the recent Louisiana case of *Bryant v. St. Paul Fire & Marine Ins. Co.,* 365 So.2d 537 (La.App.1978) which holds that the liability of a hospital to a patient depends upon proof of ordinary negligence or as the court in *Bryant* stated from the Louisiana Supreme Court decision in *Hunt v. Bogalusa Community Medical Center,* 303 So.2d 745 (Sup.Ct.La.1974):

> A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case.

303 So.2d 745, 747.

The *Bryant* court then said:

> The standard of care enunciated above does not require the establishment of a "community standard" in order to make a determination of negligence of hospitals.

365 So.2d at 540.

▪ The trial court placed its decision to direct a verdict in favor of the hospital and clinic upon its assumption "that the plaintiff would visit liability on the defendant Ochsner Clinic and the defendant Foundation Hospital through the alleged negligence of the doctor defendants here." To the extent that the trial court relied upon the failure to establish sufficient evidence of the doctors' liability under the "community standard," it would be improper for the court to hold the plaintiff to the strict proof against the hospital and clinic that is required as against the doctors. However, the court further stated "nor has there been any evidence of any other negligence [besides that of the doctors] which could be

attributable to the defendant Ochsner Clinic and defendant Ochsner Foundation which would warrant us denying the motion for a directed verdict." What we have stated above with respect to the error in directing the verdict against the doctors, of course, applies with greater force against the other defendants in light of the fact that the plaintiff is not required to prove either the existence of or the content of a "community standard" to establish liability of the hospital and foundation. There was more than sufficient evidence from which the jury could have inferred negligent conduct by these two defendants as well as by the doctors.

The judgment is REVERSED and the case is REMANDED for further proceedings not inconsistent with this opinion.