552 So.2d 430 (1989)
Ora Mae PETERS
v.
ABC INSURANCE COMPANY, and its Insured, Joshua O. Williams, Jr., M.D., DEF Insurance Company and its Insured, Don E. Carter, M.D., and Life Mark Hospital of Louisiana, Inc. d/b/a St. Claude General Hospital of New Orleans.
No. 88-CA-2210.
Court of Appeal of Louisiana, Fourth Circuit.
October 12, 1989.
Morris W. Reed, Law Offices of Morris W. Reed, New Orleans, for plaintiff-appellant.
*431 C. William Bradley, Jr., Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, for defendants-appellees.
Before BARRY, WARD and WILLIAMS, JJ.
BARRY, Judge.
Mrs. Ora Mae Peters brought this medical malpractice suit against Dr. Joshua Williams, Dr. Don Carter, their insurers, and Life Mark Hospital of Louisiana, Inc., d/b/a St. Claude General Hospital of New Orleans. St. Claude General was dismissed pursuant to a settlement with all rights reserved against the remaining parties.
At the close of plaintiff's case, Dr. Carter's motion for a directed verdict was granted and after trial the jury returned a verdict in favor of Dr. Williams. A motion for judgment notwithstanding the verdict or, alternatively, for a new trial was denied.
Mrs. Peters was diagnosed by Dr. Carter as having a kidney infection due to a kidney stone and was admitted into St. Claude General Hospital on February 10, 1982. Dr. Carter decided surgery was necessary and referred Mrs. Peters to Dr. Williams, a member of the hospital's two person urological staff.
Dr. Williams, whose surgical skills impressed Dr. Carter and who (according to Dr. Carter) had been praised by other doctors, saw Mrs. Peters about February 26, 1982. On March 1 a pelviolithotomy (kidney stone removal) by Dr. Williams with Dr. Carter assisting was unsuccessful. Dr. Williams did not charge a fee. After following her for about three months, Dr. Williams notified Mrs. Peters he was closing his office and informed her she could see Dr. Franciso Jaramillo, the other urologist at St. Claude General.

BASIS FOR DIRECTED AND JURY VERDICT
Dr. Carter,[1] an expert in the general practice of medicine, testified that an x-ray taken just prior to surgery indicated the stone was in the same place as it had been earlier during Mrs. Peters hospital stay. In surgery the patient was lying on her side in a slight jackknife position. Dr. Williams made an incision in the area where the stone appeared on the x-ray. The stone was not located and Dr. Williams used forceps "to explore certain little pockets in the kidney to try to reach the stone." He then "percussed" or gently tapped the kidney and irrigated the kidney in an attempt to flush the stone out. He took intraoperative x-rays but could not locate the stone.
Dr. Carter testified that Dr. Williams handled the surgery in a very methodical and cautious manner. He said many doctors would sacrifice part of the kidney in order to say they got the stone, but Dr. Williams preserved the kidney. He stated x-rays could not be taken in the operating room until the patient was "opened," and Dr. Williams never discussed using a nephroscope.[2]
Dr. Carter testified that a doctor can practice a specialty without board certification and no hospital requires that the person who assists in surgery be a physician. The assistant's duty generally involves following the surgeon's directions. Dr. Carter felt it was his duty to reassure Mrs. Peters' family because he was their physician. Since the surgery on Mrs. Peters, he has assisted Dr. Jaramillo and various specialists in surgery and continued to treat other members of Mrs. Peters' family.
In 1987 Dr. Norman R. Galan, an expert in urology and the general practice of medicine, saw Mrs. Peters for intermittent and recurrent left back pain and successfully performed a lithotripter procedure (unavailable in 1982) to break up the stone with shock waves. Dr. Galan testified for Mrs. Peters and explained that kidney stones are mobile and Mrs. Peters' stone moved after the 1982 pre-operative x-ray and before surgery. He concluded Dr. Williams' techniques were the same he would use; however, he would have used a nephroscope to *432 attempt visual access into the kidney calices, though all hospitals did not have that instrument.
Dr. Galan would not say the standard of care in 1982 required the availability of a nephroscope and admitted he did not know the standard of care at that time.
Dr. Galan noted that the nephroscope, which costs under $3,000, has been replaced by the lithotripter procedure. He agreed with Dr. Carter that an x-ray could not be done when a patient is on the operating table until the incision is made. He said board certification is not necessary to practice a specialty and he practiced urology before he was certified. He stated his partner or a general surgeon usually assisted him in surgery.
Dr. Galan also testified that he would have tried to alter the patient's position or use "kidney beam" film to make the stone visible. He pointed out that the kidney beam film, which obviates everything but the kidney, was not widely available in 1982. He stated, however, that neither the nephroscope nor the kidney beam film would have guaranteed finding the stone. He said it was good, proper care to close the surgical opening "after a point".
Dr. Galan stated the normal follow up would include an office visit every three months (immediately if there was pain) since an infection could rapidly destroy the kidney. He stated this type of surgery was painful because it involved excising various muscle groups and many nerves become stretched or severed. Further, he noted it is possible to have pain near the incision scar years later.
As Mrs. Peters' treating physician, Dr. Galan felt that if she had any damage from the original surgery it was "not very significant."
Dr. Raju Thomas, plaintiff's expert in urology and the general practice of medicine, finished his residency in 1982. He stated that in 1982 he would not automatically use a nephroscope, rather his "first intention" would be to remove the stone and his "second" would be to avoid damage to the kidney, and "above all not to loose [sic] it." He said there is a 5 per cent chance a stone will move. He stated that a prudent medical practitioner who had a nephroscope available would have it at surgery in case the stone could not be located. However, he would not say that was the practice in 1982. He pointed out that in 1982 the nephroscope was of a rigid metal which could not be used to "poke around" the kidney without destroying it and the instrument was not considered effective. He felt Dr. Williams used everything except a nephroscope (if it was available). He agreed the nephroscope would not guarantee location of a stone.
Dr. Thomas testified that a general practitioner's "proper standard of care is to find the best possible surgeon to operate on your patient" and that the doctor would usually make referrals to another doctor who practices at the patient's hospital. He did not testify as to whether Dr. Carter's actions fell below the proper standard of care.
Dr. Thomas noted two types of x-rays which might have been used on Mrs. Peters intraoperatively, depending on availability. He noted each technique used to locate the kidney stone had to be done quickly or risk bleeding and loss of the kidney.
According to Dr. Thomas' review of the records of Mrs. Peters' surgery, Dr. Williams used every procedure and technique to locate the stone that was available to him in 1982, including an intraoperative x-ray, and he concluded Dr. Williams did not violate the standard of care in 1982.
At the time of trial Dr. Williams was a general practitioner at a clinic in Charity Hospital. He testified that he made one unsuccessful attempt to become board certified. When asked if Dr. Jaramillo was board certified, he stated "I think so. I think so. That is all I know." Though Dr. Williams taught urology, he never taught use of the nephroscope.
Dr. Williams stated that he operated the nephroscope "fairly well." He stated "[t]he instrument was a prototype of what we have now, it is a far cry from the type of instruments that we have now." Dr. Williams further stated:

*433 My reason for not using or having [a] cystoscope[3] with Mrs. Peters was that Mrs. Peters[,] as of 1980[,] that I knew of[,] had a pelvic renal stone. Mrs. Peters at the time I saw her two years later very likely had not onlynot only had the stone for two years [sic] established she very likely had it longer. It has been my experience when an individual has a kidney stone of that nature having fever and repeat bouts of infection when the stone is generally encased into the pelvis forming ... itself within the contour or shape of the pelvis of the kidney [sic]. Generally, when you go to remove these kinds of stones, they are encased. You have to be very delicate in removing them because you can ruin the pelvis of the kidney in trying to scrape it out and trying to remove it.
* * * * * *
[S]he had some very narrow infundibula of the calices.... I made a medical judgment because of the encasement, the general encasement of the stone in the pelvis, because of the repeat inflammatory process, the experience that I had with the narrowing of the infundibula, this was a pelvic stone and that what I had available to me in the O.R. would be adequate.[4]
Dr. Williams said he asked Dr. Jaramillo why a nephroscope was not used and was told none were available. Dr. Williams stated St. Claude General did not have a kidney beam x-ray machine.
Dr. Williams pointed out that Mrs. Peters entered the hospital with high fever and an infection in the area of the kidney outflow and that after the operation, the stone was in a calix, thereby lessening the symptoms for the patient.
Mrs. Peters testified that she consulted Dr. Carter for kidney stone problems in February and March of 1982 and he recommended surgery by Dr. Williams. On the day of surgery x-rays were taken and she was brought to surgery. After surgery Dr. Williams apologized for not removing the stone. Mrs. Peters testified that there was no conversation regarding a nephroscope, but Dr. Williams told her that if he had had an "eye", he could have found the stone.
After surgery Mrs. Peters saw Dr. Carter "a couple of times" and then Dr. Brunner, a urologist. Later she saw Dr. Mottram who recommended Dr. Galan for a lithotripter procedure.
Dr. Ronald Swartz, defendants' expert urologist, reviewed Mrs. Peters' hospital records and testified that the 1982 surgery was necessary. He basically agreed that Dr. Williams had done everything he should have done to locate the stone. He noted that in surgery a urologist had to use his judgment as to how to proceed, weighing the possibility of finding the stone versus doing irreversible harm to the kidney. He said that in 1982 less than half of the urologists used or had a nephroscope available and less than half of the hospitals had that device. He stated a nephroscope was not indispensable in March, 1982 and the standard of care did not require it.
Mr. Peters, plaintiff's husband, testified that Dr. Williams stated if he had the right equipment he could have located the stone.
A court of appeal may not set aside the trier of fact's finding unless it is manifestly erroneous or clearly wrong, and where testimony conflicts, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are as reasonable. Rosell v. ESCO, d/b/a Jolly Elevator Corp., 549 So.2d 840 (La.1989).
We do not find manifest error or that the jury was clearly wrong in concluding that Dr. Williams' conduct met the acceptable medical standard of care.

EXCLUSION OF WITNESSES
The testimony of two witnesses was excluded because their names were not disclosed in plaintiff's answers to interrogatories *434 or her witness list prior to trial. According to the March 7, 1988 pretrial order,
In Jury cases each party shall file a list of witneses at the conference on the morning of trial to be read to the Jury. Any witnesses not listed will be prohibited from testifying.
Plaintiff did not file a witness list until after the first day of trial.
Mrs. Peters claims the undisclosed witnesses should have been allowed to testify because the defendants would not have been prejudiced.
The rejected testimony, made part of the record by proffer, states that when Dr. Williams came out of the operating room he apologized and stated he could have removed the stone if he had the right equipment.
Identical testimony from Mrs. Peters and her husband was heard by the jury and Dr. Williams admitted making the statement.
Much discretion is given to the trial judge in deciding whether to modify a pre-trial order. Neff v. Rose, 546 So.2d 480 (La.App. 4th Cir.1989). Mrs. Peters offers no argument that the trial court abused its discretion.
We find no abuse of the trial court's discretion.

JURY INSTRUCTIONS AND POLLING
Mrs. Peters objects to several jury instructions. We refer to her brief's numbers to dispose of each.
Numbers 2 and 3 deal with quantum, an issue not reached by the jury and which is irrelevant.
Numbers 1, 4, 10, 11, and 12 relate to the failure to explain the terms "inference, presumption, prima facie case, circumstantial evidence, impeachment evidence, prior inconsistent statement." Numbers 1 and 4 through 9 concern plaintiff's general contention that the jury charges contained incorrect statements of law, were cumulative, prejudicial, vague and misleading. We find no merit in any of those contentions and plaintiff's reliance on Downs v. American Emp. Ins. Co., 423 F.2d 1160 (5th Cir.1970) is misplaced. La.R.S. 9:2794.
The plaintiff urges that the manner in which the jury was polled caused one juror to change his mind.
The trial court asked the jurors to acknowledge whether the read verdict was their verdict. The first five jurors responded in the affirmative. The sixth and seventh responded in the negative. The eighth juror responded "Yesyou want the answer in the room? No." At that point another juror stated "We are all confused" and another stated "We are mixed up." The Court then started the poll again and the answers were the same except Nos. 7 and 8 answered affirmatively. Polling was completed with nine jurors responding affirmatively.
We find no error in the manner the jury was polled.

DIRECTED VERDICT
Mrs. Peters urges the trial court erred by granting a directed verdict in favor of Dr. Carter. A plaintiff in a medical malpractice claim is required to establish a violation of the standard of care for the community. La.R.S. 9:2794.
No expert witness testified that Dr. Carter breached the proper standard of care. The directed verdict in favor of Dr. Carter was appropriate.
Likewise, there is no merit in Mrs. Peters' contention that "the Trial Court's errors throughout the entire trial created an atmosphere whereby the jury was confused, misled, and/or unable to understand the law as stated to them, and which consequently committed manifest error which must be reversed in this instance."
Dr. Carter answered the plaintiff's appeal contending the appeal of the directed verdict was frivolous. We do not believe "the appeal was taken solely for delay or that counsel is not sincere in the view of the law he advocates...." Parker v. Interstate Life and Accident Ins. Co., 248 La. 449, 179 So.2d 634, 636 (1965). Dr. Carter's demand for damages is rejected.
*435 The judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Dr. Carter was the first witness to testify.
[2] A nephroscope is a telescopic device to look inside the kidney.
[3] Apparently a reference to the nephroscope.
[4] The court reporter did a sloppy job throughout the transcript.