640 So.2d 281 (1994)
Yevon M. PFIFFNER, et al.
v.
Amilcar J.E. CORREA, M.D., I.L. Fontenelle, M.D., St. Claude General Hospital and Diagnostic Services Inc.
No. 91-CA-2734.
Court of Appeal of Louisiana, Fourth Circuit.
January 13, 1994.
Rehearing Denied February 17, 1994.
Writ Granted June 3, 1994.
*283 Darryl J. Tschirn, Metairie, for plaintiff/appellant.
Stewart E. Niles, Jr., Joan Winters Burmaster, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendant/appellant Dr. Amilcar J.E. Correa.
Edward J. Rice, Jr., L. Thomas Styron, Adams and Reese, New Orleans, for defendant/appellant, Dr. I.L. Fontenelle.
Bruce J. Toppin, Patricia A. Bethancourt, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for intervenor/appellant, LA Patient's Compensation Fund.
Before SCHOTT, C.J., and BARRY, WARD, JONES and WALTZER, JJ.
BARRY, Judge.
The primary issues in this medical malpractice suit are whether the claim against Dr. Fontenelle prescribed, whether the standard of medical care was established, and whether a breach of that standard was proven. The plaintiff, Mrs. Pfiffner, did not call a medical expert but relied on cross-examination of the defendant doctors to establish the standard of care.
On April 16, 1984 Yevon Pfiffner, individually and on behalf of her deceased husband, James, sued: Dr. I.L. Fontenelle, a general practitioner; Dr. Amilcar Correa, a neurosurgeon; Diagnostic Services, Inc., the CAT scan provider; and St. Claude General Hospital. (Suit # 84-6123). She alleged that the defendants were solidarily liable for her husband's death. Dr. Fontenelle's exception of prematurity was maintained and he was dismissed without prejudice on July 20, 1984 by a consent judgment. Diagnostic Services was dismissed on the same day because Mrs. Pfiffner failed to amend her petition after its exception of no cause of action was maintained.
On April 13, 1984 Mrs. Pfiffner filed a complaint with the Commissioner of Insurance against Doctors Fontenelle and Correa (her letter to the Commissioner is dated April 11). A Medical Review Panel rejected the complaint in separate opinions. On September 16, 1987 Mrs. Pfiffner filed a second suit against the same defendants (Suit # 87-16651). Diagnostic Services' exception of res judicata was maintained based on its prior dismissal with prejudice from Mrs. Pfiffner's first suit. Mrs. Pfiffner then dismissed (without prejudice) Diagnostic Services. On February 1, 1991 Mrs. Pfiffner voluntarily dismissed St. Claude General with prejudice.
Mrs. Pfiffner cross-examined the two doctors/defendants, after which the doctors' motions for a directed verdict were denied. The motions were re-urged after the jury trial and were denied. The January 25, 1991 judgment awarded $320,000 and held Dr. Correa 60% at fault and Dr. Fontenelle 40% at fault. Motions for a new trial and a judgment notwithstanding the verdict were denied, but a motion to amend was granted. *284 The March 22, 1991 amended judgment limited the awards against Drs. Correa and Fontenelle to $100,000 pursuant to La.R.S. 40:1299.47 and the remaining $120,000 was awarded against the Louisiana Patient's Compensation Fund. A March 27, 1991 judgment maintained Dr. Fontenelle's exception of prescription and amended the March 22, 1991 judgment to dismiss Dr. Fontenelle.
La.C.C.P. art. 1951 does not permit a substantive amendment to the January 25, 1991 judgment. Reed v. St. Charles General Hospital, 602 So.2d 784 (La.App. 4th Cir.1992). The altered awards against Drs. Correa and Fontenelle and the award against the Louisiana Patient's Compensation Fund were substantive in nature. The March 22, 1991 amended judgment is a nullity and is hereby vacated.
Dr. Correa's appeal submits three arguments:
Mrs. Pfiffner did not establish the standard of care required of a neurosurgeon to treat Mr. Pfiffner's symptoms;
Mrs. Pfiffner did not establish a breach of the standard of care;
No expert evidence was presented to establish medical causation.
Mrs. Pfiffner, as cross-appellant, appeals the judgment which maintains Dr. Fontenelle's exception of prescription. Dr. Fontenelle appealed; however, his exception of prescription had been granted (March 27, 1991 judgment). He subsequently filed an appellee brief.
The Patient's Compensation Fund intervened in the appeal because both doctors are health care providers (R.S. 40:1299.41) and submits:
Mrs. Pfiffner did not present expert testimony to establish the standard of medical care and its breach;
Mrs. Pfiffner relies on testimony which is based on speculation and conjecture;
The motions for judgment notwithstanding the verdict should have been granted.

PRESCRIPTION AS TO DR. FONTENELLE
Mrs. Pfiffner appeals Dr. Fontenelle's dismissal based on prescription.
The alleged malpractice occurred between April 18-23, 1983. Mrs. Pfiffner filed a complaint with the Commissioner of Insurance against Dr. Fontenelle and Dr. Correa on April 13, 1984. On April 16, 1984 she sued Dr. Fontenelle, Dr. Correa, Diagnostic Services and St. Claude General based on solidary liability (Suit # 84-6123). Dr. Fontenelle's exception of prematurity was maintained and he and Diagnostic Services were dismissed without prejudice.
The Medical Review Panel rejected Mrs. Pfiffner's claim as to Dr. Fontenelle on September 9, 1986 and she was notified on September 11, 1986. The panel rejected the claim against Dr. Correa on June 16, 1987 and Mrs. Pfiffner was notified on June 18, 1987. On September 14, 1987 Mrs. Pfiffner filed the second suit against both doctors, St. Claude General and Diagnostic Services (Suit # 87-16651).
According to La.R.S. 9:5628, an action against a physician shall be filed within one year from the date of the discovery of the alleged act of neglect or omission. A claim filed with the Commissioner of Insurance suspends the prescriptive period until 90 days after notification of the Medical Review Panel's decision. La.R.S. 40:1299.47(A)(2)(a).
Dr. Fontenelle submits that the 90 day period begins September 11, 1986 when Mrs. Pfiffner received notice of the Panel's opinion and her claim prescribed.
Mrs. Pfiffner responds that prescription began when the decision as to Dr. Correa was received on June 18, 1987. Her suit filed on September 14, 1987 was within the 90 day period.
The Medical Malpractice Act shall be strictly construed. Williams v. St. Paul Insurance Companies, 419 So.2d 1302 (La.App. 4th Cir.1982), writ denied, 423 So.2d 1182 (La.1982). La.R.S. 40:1299.47(A)(2)(a) does not cover a situation when the Medical Review Panel separates claims against two allegedly solidarily liable doctors. Mrs. Pfiffner *285 states that she waited for both opinions because she filed suit and a claim with the Commissioner of Insurance against both doctors as solidary obligors.
To support its conclusion that the claim against Dr. Fontenelle had prescribed, the trial court stated that Mrs. Pfiffner's 1984 suit was dismissed on June 20, 1984 based on prematurity (the correct date is July 20, 1984). On that erroneous conclusion the court decided that Mrs. Pfiffner's claim prescribed 90 days after September 10, 1986, the date Mrs. Pfiffner was notified of the Panel's opinion as to Dr. Fontenelle. The court declared that the Panel's decisions as to Dr. Fontenelle and Dr. Correa were rendered independently and suit had to be filed within 90 days of each notice. The court rejected the argument as to solidary liability of the doctors.
Mrs. Pfiffner's 1984 suit was not dismissed on June 20 or July 20, 1984; rather, Diagnostic Services was dismissed on July 20, 1984. The same day Dr. Fontenelle was dismissed without prejudice based on prematurity. Mrs. Pfiffner's 1984 suit was pending until it was abandoned under La.C.C.P. art. 561. According to the motion filed by American Medical International, Inc. (formerly St. Claude General), the last pleading in the 1984 case was filed January 22, 1986 and the suit was legally abandoned five years later as of January 22, 1991. The motion to dismiss was granted on January 25, 1991.
Although Dr. Fontenelle now argues that Mrs. Pfiffner had 90 days from September 10, 1986 to file suit, he never filed an exception of prescription until the five year abandonment occurred. He filed a prescription exception on February 28, 1991 after judgment was rendered in the 1987 suit. The exception was maintained on March 27, 1991.
Prescription as to one solidary obligor is suspended by the filing of a medical review claim against any other solidary obligor. La. R.S. 40:1299.47(A)(2)(a); Graham v. St. Charles General Hospital, 590 So.2d 818 (La. App. 4th Cir.1991). As long as the 1984 suit was pending against one solidarily liable defendant, prescription was interrupted as to the other solidary obligors.
Dr. Fontenelle strenuously argues that he and St. Claude General are not solidarily liable, but their solidary liability is not required under this procedural scenario. Dr. Fontenelle had been dismissed without prejudice from the 1984 suit because his dilatory exception of prematurity was maintained. Dismissal was correctly rendered (without prejudice) to allow Mrs. Pfiffner to bring suit at a later date against that defendant. La. C.C.P. art. 933 Official Revisions Comment(c); Rausch v. Hanberry, 377 So.2d 901 (La.App. 4th Cir.1979).
Both parties cite C.C. art. 3463 which provides in part: "Interruption is considered never to have occurred if the plaintiff abandons, voluntarily dismisses, or fails to prosecute the suit at the trial." Dr. Fontenelle claims that after Mrs. Pfiffner's 1984 suit was dismissed as abandoned, any interruption relating to that suit is considered never to have occurred.
A second suit which was filed after the original suit was dismissed or abandoned is considered as never having been filed and prescription is applicable. To the contrary, a second suit filed before the original suit was abandoned or dismissed interrupts prescription. Prescription does not accrue because the second suit interrupts prescription. Tug Alamo Inc. v. Electronic Service Inc., 275 So.2d 419 (La.App. 4th Cir.1973). If the second suit is filed prior to abandonment of the first suit, the interruption provided by the first suit continues until the second suit is filed and interruption continues after the suit is dismissed because the second suit is pending. Levy v. Stelly, 277 So.2d 194 (La.App. 4th Cir.1973), writ denied, 279 So.2d 203 (La.1973).
The original suit filed on April 16, 1984 was pending when the Medical Review Panel rendered the two opinions and the second suit was filed on September 14, 1987. On January 22, 1991 the first suit was legally abandoned and dismissed on January 25, 1991. "A suit not prescribed when filed cannot later become prescribed by the subsequent dismissal of a previous suit on the same cause of action." (Footnote omitted). Levy, 277 So.2d at 196.
*286 The trial court erred by misconstruing the July 20, 1984 consent judgment (and dismissed Mrs. Pfiffner's 1984 suit) when the consent judgment only dismissed Dr. Fontenelle without prejudice based on prematurity and the second judgment dismissed Diagnostic Services. We therefore reject Dr. Fontenelle's exception of prescription which was filed in this Court. The judgment which maintained Dr. Fontenelle's exception of prescription is reversed.

BURDEN OF PROOF
Pursuant to La.R.S. 9:2794(A) a medical malpractice claimant must prove:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred....
A plaintiff must establish by a preponderance of the evidence that the treatment was below the standard of care for a particular specialty and there was a causal relationship between the alleged negligent treatment and the injury. Expert medical testimony is necessary to prove that a doctor possessed the required skill and knowledge or failed to exercise reasonable care and diligence. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Cherry v. Herques, 623 So.2d 131 (La.App. 1st Cir. 1993). When a general practitioner is the defendant the plaintiff must establish the community standard. Id.
The absence of expert testimony as to a breach of the standard of care precludes medical malpractice. Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5th Cir.1991). If a medical expert does not establish a breach of care, a directed verdict is appropriate. See Peters v. ABC Insurance Company, 552 So.2d 430 (La.App. 4th Cir.1989); Gurdin v. Dongieux, 468 So.2d 1241 (La.App. 4th Cir.1985), writ denied, 474 So.2d 946 (La.1985).
Expert testimony is not necessary when a layman's knowledge is sufficient to infer negligence from the facts. Expert testimony is unnecessary if a physician commits an obvious negligent act such as fracturing a leg during an examination or dropping a scalpel or acid on a patient. Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986). In a specialized area such as surgery, expert testimony is usually necessary. See LeBlanc v. Krupkin, 555 So.2d 600 (La.App. 1st Cir.1989), writ denied, 558 So.2d 603 (La.1990).
A factual determination should not be reversed on appeal unless the record establishes that the conclusion(s) are clearly wrong or manifestly erroneous. Stobart v. State through Department of Transportation and Development, 617 So.2d 880 (La.1993). "[I]f the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). When a trier of fact's conclusion "is based on its decision to credit the testimony of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Id. at 845.

TESTIMONY
Mr. Pfiffner was a 46-year-old longshore foreman who suffered from obesity, high blood pressure, diabetes and heart problems. While at work on April 12, 1983 he was struck on the face and shoulder when a crane *287 broke. He experienced headaches and on April 18 went to St. Claude General's emergency room where the diagnosis was "neck pains." The doctor's notations show that Mr. Pfiffner's chest was clear, his heart was checked by an EKG, and his pupils reacted to light and were not constricted. He had complained of dizziness and blurred vision the previous two days. He did not vomit but was nauseated. Dr. Fontenelle, Mr. Pfiffner's general practitioner, was contacted by the emergency room doctors and he prescribed a muscle relaxant and pain medication. Mr. Pfiffner was told by the emergency room personnel to see his personal physician the next day. Mrs. Pfiffner said she and her husband were forced to leave the hospital even though they wanted to stay until his condition improved and he was no longer in pain.
The next day, April 19, Dr. Fontenelle called the Pfiffners and Mr. Pfiffner went in for an examination. Dr. Fontenelle did not remember the time, but his notes reflect that the examination took place about 3:00 p.m. Mrs. Pfiffner testified the exam was around 8:00 a.m. Dr. Fontenelle found nuchal rigidity (neck stiffness) and pupil constriction. Because those findings were different from the night before and indicated a central nervous system disorder, Dr. Fontenelle recommended that a neurosurgeon be consulted. He contacted Dr. Correa because a member of Pfiffner's family did bookkeeping work for Dr. Correa. Dr. Fontenelle testified that it was proper for him to monitor Mr. Pfiffner's condition from April 18 to April 19 by telephone and he did not breach the standard of care.
Dr. Correa, board certified in neuroimagery and neurological surgery, testified on cross-examination that his clinic opened at 2:00 p.m. According to Linda Castillo, Dr. Correa's receptionist, Dr. Fontenelle's call to Dr. Correa was around 3:00 p.m. and Mr. Pfiffner arrived soon after. There was conflicting testimony as to how long the Pfiffners waited. According to Dr. Correa and Ms. Castillo, Mr. Pfiffner was seen shortly after he arrived. Mrs. Pfiffner testified they waited at Dr. Correa's office from 9:15 a.m. until about 2:00 p.m. Mrs. Pfiffner's May 1990 deposition stated that they waited 35-40 minutes.
On cross-examination Mrs. Pfiffner testified that she suffered a stroke after Mr. Pfiffner's death and she might be mistaken about some details. Mr. Pfiffner's foster daughter, Linda Pearson, who worked for a company which did bookkeeping for Dr. Correa across the hall from the doctor's office, testified that the Pfiffners arrived at Dr. Correa's office about 9:30 or 10:00 a.m. and Dr. Correa did not see them until about 1:30 p.m.
Dr. Correa testified that he examined Mr. Pfiffner and observed pupil constriction and nuchal rigidity, but he did not find papilledema or swelling of the head or optic nerve and the optic nerve did not indicate increased intracranial pressure. Due to the absence of papilledema, Dr. Correa performed a diagnostic lumbar puncture and gave the spinal fluid to Ms. Pearson to take to the hospital for analysis. Dr. Correa stated that he was sending Mr. Pfiffner to De La Ronde Hospital at the family's request, but Mrs. Pfiffner disagreed. Dr. Correa had the ambulance stop at New Orleans General for a CAT scan by Diagnostic Services, Inc., which, according to Dr. Correa (a part-owner), had the newest scanners.
The diagnosis from two CAT scans was cerebritis, an inflammation of the brain and there was a "space occupying lesion consistent with intracerebral abcess [sic] in the posterior parietal area on the right hemisphere." Because a brain abscess might require surgery, Dr. Correa diverted the ambulance to Chalmette General which had the requisite equipment.
Chalmette General's records state that Mr. Pfiffner had a seizure when he arrived hours after he had left Dr. Correa, and the seizure caused the brain to swell. Dr. Correa did not go to the hospital the night of April 19, but stayed in contact with the hospital staff.
Mr. Pfiffner's electroencephalogram on April 20, 1983 showed a space occupying lesion. Dr. Correa stated that the lesion never encapsulated. Mr. Pfiffner was treated with steroids, infused with Mannitol to dehydrate the brain and to hyperventilate. *288 Those procedures were not successful and Mr. Pfiffner went into decerebration, then a coma followed by death on April 23, 1983. Dr. Correa stated that he complied with the prevailing standard of care for a neurosurgeon.
Chalmette General's records show that the final diagnosis was "intracranial space occupying lesionbrain abscesses...." The cause of death was respiratory arrest due to "increased intracranial pressure" caused by a "cerebral abscess." No autopsy was performed.
Dr. Correa stated that he did not perform surgery on the night of April 19 (he did not go to the hospital) or the next morning (when he first saw Mr. Pfiffner at the hospital) because Mr. Pfiffner's condition did not require surgery. However, he had Mrs. Pfiffner sign a surgery consent form on April 20, 1983.
In a June 29, 1983 letter to Mr. Pfiffner's employer's insurance adjuster, Dr. Correa stated Mr. Pfiffner had "a space occupying lesion consistent with intracerebral abscess...." Dr. Correa decided "to treat Mr. Pfiffner surgically in an effort to remove the brain abscess...." Dr. Correa went on to say that the seizure compelled him to wait. According to Dr. Correa the "radiological images on the CAT scan ... suggest that Mr. Pfiffner had a brain abscess or a necrotic tumor in the brain...."

ANALYSIS
Mrs. Pfiffner submits that cross-examination of Dr. Fontenelle and Dr. Correa established the appropriate standards of care and their testimony proved there was a breach.
Mrs. Pfiffner relies on Hemingway v. Ochsner Clinic, 608 F.2d 1040 (5th Cir.1979), wherein the U.S. Fifth Circuit reversed a directed verdict. In Hemingway a medication that was clearly contraindicated by the patient's condition of arterial insufficiency (and noted in his medical chart) was administered to the patient. Hemingway held that the cross-examination of the defendant doctors established the community standard relating to the administration of a contraindicated drug. The court stated that the jury could infer that the doctors had knowledge of the vascular insufficiency before prescribing a drug which constricted the patient's blood vessels.
Hastings, 498 So.2d at 713, cited by Mrs. Pfiffner, also involved reversal of a directed verdict. A patient had two stab wounds when he arrived at the emergency room. He did not have insurance, was denied a thoracotomy and was transferred to another hospital. The patient died in the ambulance. The court stated that the jury could infer negligence from the obviously negligent acts of the doctors.
Mr. Pfiffner was in obvious distress and his condition was rapidly deteriorating on April 19, 1983 when he saw Dr. Correa. Dr. Correa testified at length about the treatment for patients with symptoms of abnormalities in the central nervous system. He emphasized that treatment should begin as soon as possible and was emphatic that time was important because Mr. Pfiffner had a possible brain abnormality. Dr. Correa's testimony established the standard of care for a neurosurgeon.
Dr. Correa performed a spinal tap in his office and the fluid was sent with Ms. Pearson to the hospital laboratory. Time was crucial, but Dr. Correa had the ambulance stop at New Orleans General for CAT scans at Diagnostic Services. Dr. Correa sent the ambulance to St. Claude General, but changed his mind when the CAT scans revealed a possible abscess which required surgery. The ambulance was diverted to Chalmette General. Crucial hours had passed from the time Dr. Correa examined Mr. Pfiffner until he finally arrived at Chalmette General. Mr. Pfiffner suffered a seizure, lost consciousness and never awoke again.
Considering the evidence and the detailed, candid testimony of Dr. Correa, the jury could have reasonably concluded that there was a breach of the neurosurgeon's standard of care and that breach contributed to Mr. Pfiffner's death.
Dr. Fontenelle's testimony established the community standard for a general practitioner. He totally relied on telephone *289 conversations with emergency room personnel and their diagnosis to prescribe medications for the seriously ill Mr. Pfiffner. He did not examine Mr. Pfiffner until the following day when his condition had become critical. We have made an exhaustive review of the record and do not find manifest error in the jury's finding that Dr. Fontenelle breached the community standard for a general practitioner and that breach contributed to Mr. Pfiffner's death.
The amended March 22, 1991 judgment is vacated. The January 25, 1991 judgment is amended to provide:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be Judgment herein in favor of the plaintiff Yevon Pfiffner, and on behalf of her deceased husband James A. Pfiffner, in the amount of $320,000.00; and that there be judgment against defendant Dr. Amilcar J.E. Correa in the amount of $100,000.00; and against defendant, Dr. I.L. Fontenelle in the amount of $100,000.00. The State of Louisiana, Office of the Governor, Patients' Compensation Fund, pursuant to the Medical Malpractice Act be and is hereby cast in the amount of $120,000.00 plus interest on the entire Judgment ($320,000.00) from the date of judicial demand.
Further, this Court overrules Dr. Fontenelle's exception of prescription and reverses the trial court's judgment which granted the exception.
PRESCRIPTION EXCEPTION AS TO DR. FONTENELLE OVERRULED; JUDGMENT MAINTAINING PRESCRIPTION EXCEPTION REVERSED; MARCH 22, 1991 JUDGMENT VACATED; JANUARY 25, 1991 JUDGMENT AMENDED AND AFFIRMED AS AMENDED.
WARD, J., dissents.
SCHOTT, C.J., dissents for reasons assigned in Judge WARD's opinion.
WARD, Judge, dissenting.
The majority upholds a jury verdict finding Drs. Fontenelle and Correa guilty of malpractice although (1) no evidence was introduced to show the standard of care of physicians, (2) no evidence was introduced to show a breach of that standard, and (3) there is no evidence that any alleged medical malpractice caused Mr. Pfiffner's death. The majority then reverses a trial court judgment which held that Mrs. Pfiffner's cause of action against Dr. Fontenelle was barred by prescription.
I disagree with every conclusion reached by the majority.

PRESCRIPTION
I believe the majority errs when it holds that prescription does not bar an untimely suit against one defendant if the plaintiff has filed a lawsuit against a co-defendant whether or not there is a solidary obligation between the two defendants. This of course is contrary to the rule that prescription bars prosecution of the suit against the newly added defendant unless it is filed within the prescriptive period or unless there is a solidary obligation.
Neither Mrs. Pfiffner nor the majority disputes that liberative prescription bars the prosecution of malpractice claims filed more than one year after an alleged act of malpractice. LSA-R.S. 9:5628. And when a claimant files a request for review of a claim by a Medical Review Panel the filing of the request for review interrupts [suspends] the running of prescription until ninety days following notification, by certified mail, to the claimant or his attorney of the issuance of the opinion of the panel. LSA-R.S. 40:1299.47(A)(2)(a).
Mrs. Pfiffner does not contend and the majority does not find that her petition of September 14, 1987 was filed either within one year of the alleged malpractice or within 90 days following notification by certified mail. The majority concedes Mrs. Pfiffner's suit has prescribed on its face. The majority, however, holds that Mrs. Pfiffner's April 16, 1984 suit against St. Claude General Hospital and Dr. Fontenelle interrupted prescription until her second suit in 1987 was filed against Dr. Fontenelle, although Fontenelle had been long since dismissed from the first suit. The majority concludes, erroneously I believe, that the 1987 suit is timely *290 filed because it was filed before dismissal of the 1984 suit against St. Claude General Hospital.
In this case, the trial court made a finding of fact that Dr. Fontenelle and St. Claude General were not solidary obligors. Neither emergency room doctors nor anyone else at St. Claude General were negligent. Those findings are supported by the record, and the majority does not dispute this finding. As a consequence, the majority cannot rely on a solidary obligation between St. Claude General and Dr. Fontenelle to hold that prescription was interrupted for as long as the suit was pending against St. Claude General. Nor does it.
The majority says that solidarity of obligations does not matter under this "scenario." The majority finds that Mrs. Pfiffner's suit against St. Claude interrupts prescription against Fontenelle by relying on Tug Alamo Inc. v. Electronic Service Inc., 275 So.2d 419 (La.App. 4th Cir.1973) and Levy v. Stelly, 277 So.2d 194 (La.1973). Those cases stand for the rule "A suit not prescribed when filed cannot later become prescribed by the subsequent dismissal of a previous suit on the same cause of action." I find no fault with either case nor the rule above. They simply do not apply to these facts. In both Tug and Levy, suit was filed against defendants, and then dismissed. In each case, after the first suit was filed, a second suit was filed against the same defendants, before the first suit was dismissed. The first suit suspended prescription and prescription did not bar the second suit filed before the first was dismissed when it was filed against the same defendants. "A suit not prescribed when filed cannot later become prescribed by the subsequent dismissal of a previous suit on the same cause of action." This obviously has no application when, as in this case, a plaintiff untimely files a second suit against a defendant who is not solidarily liable with any defendant. Prescription once accrued is a vested right, Hall v. Hall, 516 So.2d 119 (La.1987), and it cannot be either interrupted nor suspended.
Mrs. Pfiffner filed suit against Fontenelle and St. Claude on April 13, 1984. She later joined in Fontenelle's motion to dismiss, and her suit against Fontenelle was dismissed July 20, 1984. The suit against St. Claude was open; the suit against Fontenelle was closed. Thereafter prescription barred Mrs. Pfiffner's suit against Fontenelle because when she filed her second suit against Fontenelle there was no suit pending against Fontenelle as in Tug and Levy. Tug and Levy apply when the second suit is filed on the same cause of action against the same defendant before the first is dismissed, not when the second suit is against a different non solidarily liable defendant. Tug and Levy have absolutely no applicability here.
Under the majority's decision, a new defendant may be added at any time to an old suit as long as any defendant remains in the suit, even if defendants are not solidarily liable, and solidarity is not an issue.
In summary, neither the trial court nor the majority nor I find solidary liability of Fontenelle with St. Claude General Hospital. Since St. Claude and Fontenelle are not solidarily liable, prescription was not suspended by the suit against St. Claude. When the second suit was filed against Fontenelle, there was no suit pending against him that would suspend prescription until the second suit was filed. It was barred by prescription. The majority errs by overruling the trial court's judgment that prescription bars Mrs. Pfiffner's suit against Dr. Fontenelle.

MEDICAL MALPRACTICE
To prove medical malpractice a plaintiff must establish the standard of care of physicians in the community; and, when the physician is a specialist, a plaintiff must prove the degree of care ordinarily practiced by physician within the medical specialty. The standard of knowledge, skill and care for physicians and surgeons is best determined from the testimony of other experts in the field. Stein v. Insurance Corp. of America, 566 So.2d 1114, 1119 (La.App.2d Cir), writ denied, 569 So.2d 984 (1990). There are exceptions, as when any lay person's knowledge is sufficient to understand that the act is malpractice. Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986).
*291 When, however, a case presents questions only an expert can answer, the jury is not competent to decide without expert testimony. The absence of expert testimony has proven fatal in most situations. Peters v. ABC Insurance Co., 552 So.2d 430, 434 (La. App. 4th Cir.1989), Gurdin v. Dongieux, 468 So.2d 1241 (La.App. 4th Cir.1985), Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5th Cir.1991), Hayward v. Echols, 362 F.2d 791 (5th Cir.1966), Cherry v. Herques, 623 So.2d 131 (La.App. 1st Cir.1993). Mrs. Pfiffner has not presented expert testimony to prove malpractice, and she has not met her burden of proof. As a result the jury verdict is not supported by the evidence; it is manifestly erroneous.
The majority errs when it relies on Stobart v. State of Louisiana, 617 So.2d 880 (La. 1993) and Rosell v. ESCO, 549 So.2d 840 (La.1989) to support its holding that the verdict was not manifestly erroneous. In those cases the trier of fact "was presented with two permissible views ..." of the evidence, and the trier of fact made permissible choices of one over another. The choices were not manifestly erroneous, and the Courts of Appeal erred by reversing.
In this case the jury was not presented conflicting testimony where it could make an intelligent choice between two views. The jury was not even presented two views of the evidence. The testimony of each physician was uncontradicted. The general rule is applicable, malpractice can only be proven by expert testimony except when any lay person can make an intelligent decision. In this case they could not, and an expert was necessary to prove it.
The majority suggests that the expert testimony necessary to prove the case was given by Drs. Fontenelle and Correa on cross-examination, but that is not supported by the record.

CLAIMS AGAINST DR. FONTENELLE
As to the standard of care of a general practitioner, the majority states:
Dr. Fontenelle's testimony established the community standard for a general practitioner. He totally relied on telephone conversations with emergency room personnel and their diagnosis to prescribe medications for the seriously ill Mr. Pfiffner. He did not examine Mr. Pfiffner until the following day when his condition had become critical.
The majority says Dr. Fontenelle's testimony on cross-examination established the community standard. It did not. Significantly, the majority cannot refer to any place in the transcript to support that statement.
Dr. Fontenelle testified he was called at home on the night of April 19, 1983 from St. Claude General, and was informed that a patient he had treated for obesity and diabetes had come to the hospital complaining of headaches and a stiff neck which the patient said were caused when dunnage on a ship he was unloading struck him several days before. Dr. Fontenelle spoke with Dr. Jones and Dr. Nunnery, emergency room doctors, who had examined Mr. Pfiffner. Dr. Fontenelle has known these doctors for years and had complete confidence in their competence. Tr.Vol. 3, pp 256. He relied on their opinion and diagnosis, and, he testified, this is not a deviation from the standard of care of general practitioners. Tr.Vol. 3, p. 204. Not one doctor nor any lay person contradicted Dr. Fontenelle. In light of this uncontradicted testimony, how can the majority conclude Mrs. Pfiffner established by cross-examination a standard of care of general practitioners which Dr. Fontenelle failed to exercise?
The majority is careful not to describe what the standard of care is, but it nevertheless approves a jury finding that Dr. Fontenelle did not exercise the degree of care required. As to that finding, it is important to remember that neither Dr. Jones nor Dr. Nunnery recommended to Dr. Fontenelle that he order a neurological examination or even that Mr. Pfiffner remain at the hospital. Not one of the three doctors believed Mr. Pfiffner's condition warranted hospital admission because the only symptoms Mr. Pfiffner exhibited that night were nuchal rigidity (a stiff neck) and complaints of headaches. At the time of examination, there was no papilledema, no pupil constriction, and no vomitingsymptoms which might indicate a more serious head injury. If two medical *292 doctors examined Pfiffner and three, including Dr. Fontenelle, concluded that he could go home that night but that he should see Dr. Fontenelle the next day, how can the majority second guess three medical doctors and conclude Dr. Fontenelle was guilty of malpractice? It does just this when it says the jury could conclude Dr. Fontenelle committed malpractice because:
He totally relied on telephone conversations with emergency room personnel and their diagnosis to prescribe medications for the seriously ill Mr. Pfiffner. He did not examine Mr. Pfiffner until the following day when his condition was critical.
The majority erred because it did not require expert testimony to prove malpractice in this case. Expert medical testimony was necessary both to establish a standard of care of general practitioners and to prove that Dr. Fontenelle failed to exercise such care. Mrs. Pfiffner had the burden to establish the standard and to prove Dr. Fontenelle failed to exercise the care required. She did neither, and without expert testimony neither the majority nor the jury were competent to second guess three medical doctors as to what should have been done in the emergency room that night.

CLAIMS AGAINST DR. CORREA
There is no issue of prescription barring Mrs. Pfiffner's claims against Dr. Correa; they were timely filed. Nonetheless, the malpractice claim against Dr. Correa presents the same problems as Mrs. Pfiffner's claims against Dr. Fontenelle, because she did not present expert testimony.
Dr. Correa is board certified in neuroimagery, neurological and orthopedic surgery. He teaches at Tulane Medical School, with admission privileges at Touro Infirmary, Chalmette General, and other hospitals. Dr. Correa's curriculum vitae exhibits impressive credentials in a highly specialized field of medicine.
Again, as with Dr. Fontenelle, Mrs. Pfiffner contends that she has proven the standard of care of a neurosurgeon and the breach of it by cross-examination, and the majority of this court evidently agrees. Unfortunately, the majority does not tell where it finds in the transcript that Mrs. Pfiffner established the degree of care ordinarily practiced by neurosurgeons. The majority simply summarizes what it believes is a standard of care:
Dr. Correa testified at length about the treatment for patients with symptoms of abnormalities in the central nervous system. He emphasized that treatment should begin as soon as possible and was emphatic that time was important because Mr. Pfiffner had a possible brain abnormality. Dr. Correa's testimony established the standard of care of a neurosurgeon.
Incredibly, the following testimony is what the majority believes established the degree of care of a neurosurgeon:
Q. Now, Doctor, with a patient with the symptoms of Mr. Pfiffner, ... brain abnormality, is time very important?
A. Yes.
Q. Why is time very important?
A. Time is always important in any disease. The sooner you're diagnosed and treated, the better it is.
* * * * * *
So no matter what condition you're talking about, diagnose it as soon as possible, [this] is what medicine is about. Tr.Vol. 1, pp. 47, 48
* * * * * *
Q. And that is the proper medical standard, isn't it, Doctor, that a patient such as Mr. Pfiffner with the symptoms that he had should be diagnosed as quickly as possible and treated as quickly as possible, correct, sir?
A. Correct. Tr. Vol. 1, p. 49
If this sets the standard of care for a neurosurgeon, experts need never testify.
Next, Mrs. Pfiffner argues, and the majority apparently agrees, that she has proven Dr. Correa failed to exercise the degree of care of a neurosurgeon, presumably described above. She claims that this too was established on cross-examination, and the majority opinion summarizes facts which it believes supports a jury finding that Dr. Correa did *293 not exhibit the degree of care of a neurosurgeon:
Dr. Correa performed a spinal tap in his office and the fluid was sent with Ms. Pearson to the hospital laboratory. Time was crucial, but Dr. Correa had the ambulance stop at New Orleans General for CAT scans at Diagnostic Services. Dr. Correa sent the ambulance to St. Claude General, but changed his mind when the CAT scans revealed a possible abscess which required surgery. The ambulance was diverted to Chalmette General. Crucial hours had passed from the time Dr. Correa examined Mr. Pfiffner until he finally arrived at Chalmette General. Mr. Pfiffner suffered a seizure, lost consciousness and never awoke again.
Other than the preceding recitation of events, there is no other evidence or facts that would show malpractice. However, the majority relies upon those facts and those alone in concluding that the record supports the jury finding of malpractice. As I read the majority opinion, it holds that the record supports a jury finding that Dr. Correa was guilty of malpractice by unnecessarily causing a delay between his examination and Mr. Pfiffner's arrival at the hospital, thereby causing Mr. Pfiffner's death. Whether the delay was unnecessary is a question neither the jury nor the majority are competent to answer, because it turns on the question of whether Dr. Correa wisely used the time for a spinal tap and a CAT scan, and whether those decisions as a neurosurgeon failed to meet the standards of neurosurgeons in the community.
Dr. Correa's testimony may be summarized:
When he examined Mr. Pfiffner at his office near Touro he observed pupil constriction and nuchal rigidity, but no papilledema or swelling of the head or the optic nerve, which would have indicated increased intracranial pressure. Due to the absence of papilledema, he performed a diagnostic lumber puncture which he sent to the hospital for analysis. Because there was no bacteria in the fluid, a diagnosis of chemical meningitis was made. To confirm this diagnosis, he ordered a CAT scan. He sent Mr. Pfiffner by ambulance to the hospital of Mrs. Pfiffner's choice, De La Ronde Hospital, but he directed the ambulance to stop for a CAT scan at Diagnostic Services, Inc. where state-of-the-art fourth generation nuclear scanners were available. They were not available at Touro, and because of Mr. Pfiffner's agitated state, with his constant movement, fourth generation scanners would give the best resolutions.
The diagnosis on the report of the two CAT scans was cerebritis, an inflammation of the braina "space occupying lesion consistent with intracerebral abscess in the posterior parietal area on the right hemisphere." Because this diagnosis could indicate an early stage of a brain abscess, which might be subject to surgery, he diverted the ambulance to Chalmette General Hospital because Chalmette General was equipped for neurological surgery and De La Ronde was not.
Dr. Correa also indicated in his testimony, that an operation is not possible unless the cerebritis is encapsulated (t. p. 47), and in this case Mr. Pfiffner died of respiratory arrest caused by cerebral edema, a swelling of the brain that occurred after the cerebritis which never localized, with fluid going into the subarachnoid spaces and ventricles which manifested as chemical meningitis in the spinal fluid.
Where is the unnecessary delay? Can the majority or the jury say that a CAT scan was not necessary? Can they say that the facilities at De La Ronde were adequate and that Dr. Correa erred by diverting the ambulance? Can they say unnecessary delay caused the death? Of course not.
Dr. Correa's testimony is worth summarizing because it shows, first, only an expert could say whether Dr. Correa exhibited the degree of care and skill required of a neurosurgeon under these circumstances. Next, it demonstrates why, without expert testimony, neither the jury, the majority, nor I are capable of judging whether Dr. Correa's decisions were wise or unwise. Next, it shows that Mr. Pfiffner's condition was inoperable, and delay could never be a cause in fact of Mr. Pfiffner's death.

*294 CAUSE IN FACT
Time, as it turns out, was never crucial. Unless the cerebritis encapsulated neither Dr. Correa nor any other surgeon could operate. Dr. Correa testified that Mr. Pfiffner died from cardiac arrest caused by a swelling of the brain contributed to by cerebritis which did not encapsulate. Not one expert contradicted Dr. Correa's testimony about the cause of death. It conclusively showed that neither he, nor Dr. Fontenelle, nor Drs. Jones and Nunnery could ever have done anything to save Mr. Pfiffner. While Mr. Pfiffner's death is most unfortunate, it was not caused by malpractice. It is also unfortunate that a manifestly erroneous finding of malpractice will besmirch the reputation of two doctors who are blameless.
SCHOTT, Chief Judge, dissenting for the reasons assigned in Judge WARD's opinion.
In addition, I cannot conclude as the majority does that Dr. Fontenelle committed medical malpractice by failing to meet Mr. Pfiffner at the emergency room of a hospital in response to a call that Mr. Pfiffner was there seeking medical attention.